## Shackelford v. Walker.

(Decided November 28, 1913).

### Appeal from Clay Circuit Court.

1. **Land—Ejectment—Evidence.**—In an action of ejectment, tried in equity by agreement of the parties, where the rights of the parties are dependent on whether or not the first line of a survey under which defendant claims runs South 13, West or South 30 West, evidence examined and held to show that the line runs South 13 West.

2. **Adverse Possession—Interference—Character of Possession Necessary.**—Where the deeded boundary of an inferior title holder conflicts with a superior title, and the superior title holder is in

possession under his patent, the former can acquire title by adverse possession only by entering within the lap and holding the same adversely for the statutory period.

H. C. FAULKNER and W. W. RAWLINGS for appellant.

S. B. DISHMAN and DISHMAN, TINSLEY & DISHMAN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

This action involves the title and ownership of a tract of about 225 acres of land located in Clay County, Kentucky. By agreement of the parties the case, which was brought in ejectment, was transferred to equity and tried by the chancellor. On final hearing there was a judgment in favor of defendant, E. L. Walker. From that judgment plaintiff, D. B. Shackelford, appeals.

Shackelford claims title under and by virtue of three patents: One for 250 acres, issued to John and Daniel Bates June 21, 1826, based on a survey dated March 14, 1825; one for 100 acres, issued December 5, 1822, on a survey bearing date May 6, 1822; and one for 100 acres, issued June 24, 1826, on a survey dated December 7, 1824.

Walker claims title under and by virtue of two surveys in the name of Hugh White, one for 400 acres made May 26, 1814, and one for 350 acres, made June 8, 1820. The 400-acre survey is described as follows:

"Beginning at a hickory, poplar and two beeches, being a corner to a 509-acre survey made in the name of John Bates, John W. Walker and Daniel Garrard, and in a line of a 500-acre made in the name of James Pogue; thence with a line of said Pogue's survey *S*. 13 *W*. 276 *poles* to Pogue's corner stake and two beeches, crossing two branches, one at 212 poles and the other at 250; thence West 174 poles to a sugar tree and beech; thence N. 10 E. 374 poles to two beeches; thence East 174 poles to a beech and sugar tree in a line of said 509-acre survey; thence with said line S. 100 poles to the beginning."

The 350-acre survey is as follows:

"Beginning at three beeches and a buckeye on the side of a hill 10 poles from May's Branch, and S. E. corner to a 400-acre survey made for said White; thence with a line of said 400 acres West 174 poles to a stake and corner to same; same course continued in all 290

poles to a stake; thence S. 33 W. 80 poles to an elm, sugar tree, buckeye and two beeches, one of them marked A. B. E. and the other marked H. M., 2 poles from a branch; thence S. 40 E. 268 poles to a white oak and beech trees on the side of a ridge, and corner to a 400-acre survey made for Betsey Nicholson; thence with a line of said 400 acres N. 135 poles to a white oak, chestnut and two maples on the point of a ridge, and corner to said 400 acres; thence with another line of the same East 135 poles to three beeches and a sourwood near the head of a hollow, and corner to same; thence with another line of the same South 144 poles to a white oak, black oak and sugar tree a corner to said 400 acres, also a corner to a 150-acre survey made for Messenger Lewis, thence with a line of said 150 acres N. 21 E. 259 poles to a black oak and white oak and beech tree on the point of a ridge, and corner to said 150 acres, also a corner to a 500-acre survey made for James Pogue, thence with a line of said 500 acres, N. 60 W. 100 poles to the beginning.''

The case so far as the record title is concerned, depends on the proper location of the first line of the Hugh White 400-acre survey, reading ''thence with a line of said Pogue's survey S. 13 W. 276 poles to Pogue's corner stake and two beeches, crossing two branches, one at 212 poles and the other at 250.'' Shackelford contends that the course S. 13 W. is the correct course, while Walker insists that the course should be S. 30 W. If the course is S. 13 W. 276 poles, the Hugh White surveys do not cover the land in controversy. On the other hand, if the course is S. 30 W. 276 poles, these surveys do cover the land in controversy. The land in controversy is also covered by the three Bates surveys referred to above, but of course Walker's title is superior to that of Shackelford if the land in controversy is covered by the Hugh White surveys as they are prior to the Bates surveys. The line in question calls to run with the line of a survey made in the name of James Pogue. That survey was made September 22, 1798, and the land surveyed is described as follows:

''Beginning at two mulberrys, buckeye and oak trees on a branch of Goose Creek at ''A,'' thence S. 60° W. 60 poles to ''B,'' a walnut and sugar tree, South 40° West 40 poles to an oak and walnut trees, South 20° West 40 poles to a poplar and sugar tree, South 40° East 92 poles to a sycamore tree standing on the bank of the creek, South 70° West 32 poles to a beech tree, South

14 poles to a buckeye, South 70° West 80 poles to two sycamores, North 50° West 40 poles to a sycamore tree, North 20° West 26 poles to a sugar tree, North 20° East 24 poles to a walnut tree North 24 poles to a maple tree, North 30° West 26 poles to a poplar and buckeye tree, North 70 West 158 poles to an ash tree, North 80° West 70 poles to a sugar tree at "E," South 60° West 92 poles to a beech, South 30 East 30 poles to a beech; thence S 30 West 274 poles to a stake at "F," thence North 60° West 100 poles to a stake at "G;" *thence North 30° East 274 poles to a sugar tree,* thence North 60° East 200 poles passing a corner of Governor Garrard to a poplar, thence South 83° East 350 poles to the beginning."

It will be observed that there is no line of the Pogue survey running either S. 13 or S. 30 W. 276 poles. There is a line, however, in the Pogue survey running "N. 30 E. 274 poles to a sugar tree," and it is insisted that this is the line with which the first line in the Hugh White survey was intended to run. If this line be reversed it will run S. 30 W. 274 poles. This is also the direction called for by the original plat of the Pogue survey. The evidence for the defendant shows that if this line be run from the beginning corner to the Hugh White survey S. 30 W. it will cross three branches, one at 158.8 poles, one at 205.1 poles, and another at 252 poles from the beginning point. In other words, it would cross one of the branches at 205.1 poles, or about 7 poles different from the distance indicated by the survey, and another branch at 252 poles, a difference of 2 poles from the distance indicated by the survey. On the other hand plaintiff's evidence is to the effect that if the line be run S. 13 W. 276 poles, it will cross two branches, one at 156.3 poles, and the other at 229.5 poles from the beginning point. It is further shown that on the plat made by the surveyor Andrew Bradley of the Hugh White survey two branches are located which flow into each other, whereas the two streams crossed by the line when run S. 13 W. do not flow into each other, but flow into another stream. The foregoing facts are the ones which controlled the decision of the chancellor.

On the other hand, the plaintiff introduced in evidence the record of two ejectment suits brought in the Clay Circuit Court by James Pogue, patentee of the Pogue survey, against Samuel Smith and Reuben Hall. During the proceedings John Bates and John Walker

were each made parties defendant, while Hugh White, who claimed the premises in controversy by purchase, was required to give bond for the payment of costs. During the progress of the above proceedings, Andrew Bradley, who was then county surveyor, was directed to survey and locate the James Pogue 500-acre survey. This he did on September 16, 1807, at the instance of Hugh White. He filed a report of the survey. The case was subsequently tried before a jury and a verdict rendered in favor of the defendants. This verdict was set aside. No further proceedings appear. That part of the survey material to this case is as follows:

"I attended on the land in controversy on the 16th day of September, 1807, present Hugh White and Samuel Smith, and after swearing the chainmen began at two mulberry stumps, a buckeye stump and oak tree at A, marked as a corner, and shown by James Kincaid as a corner of said survey; thence S. 43 W. 52 poles to an oak and walnut tree, marked as a corner, and shown by James Kincaid as a corner of said survey; thence S. 17 E. 40 poles to a poplar and sugar tree marked as a corner and shown by James Kincaid as a corner to said survey; thence S. 38 E. 100 poles to a sycamore tree marked as a corner standing on the bank of Goose Creek, and shown by James Kincaid as a corner of said survey; thence S. 70 W. 36 poles to a beech tree standing on the bank of said creek, marked as a corner, and shown by James Kincaid as a corner of said survey; thence S. 14 poles to a buckeye standing on the bank of said creek, marked as a corner, and found by running the true course and distance called for in the patent; thence S. 87 W. 23 poles to two sycamore trees standing on the bank of said creek marked as a corner, and shown by James Kincaid as a corner of said survey, thence N. 44 W. 40 poles to a sycamore tree standing on the bank of said creek, marked as a corner, and shown by James Kincaid as a corner of said survey; thence N. 14 W. 29 poles to a sugar tree marked as a corner, standing on the bank of said creek, and shown by James Kincaid as a corner of said survey; thence N. 20 E. 24 poles to a stake in the edge of the creek, finding no corner at the figure 9, thence N. 6 E. 26 poles, crossing Goose Creek to a May pole tree, marked as a corner, and found by the direction of James Kincaid; thence N. 30 W. 27 poles to a poplar and buckeye marked as a corner, and found by running the true course of the patent; thence N. 70 W. 170 poles

to an ash tree marked as a corner and found the true course called for in the patent, thence N. 55 W. 79 poles to a sugar tree marked as a corner, and found by the direction of James Kincaid; thence S. 60 W. 92 poles to a stake at the letter F, the true course and distance of the patent, finding no corner; thence S. 30 E. 30 poles to a stake at G, the true course and distance of the patent, but finding no corner, thence S. 30 W. 274 poles, the true course and distance of the patent to a stake at H. thence N. 60 W. 100 poles, the true course and distance called for in the patent, to a stake at I, *thence N. 13 E. 276 poles to a stake at J, at the intersection of the line, I, J & L, K, J, at J,* thence N. 60 E. 200 poles passing a corner of Governor James Garrard's survey of 500 acres, in the forks of Goose Creek, to a poplar tree marked as a corner, and found by running a true course and distance called for in the patent, thence S. 75 E. 440 poles to the beginning. 'Note all the corners that was shown by James Kincaid, was shown as corners to the foregoing survey previous to the time of surveying the same.' "

Plaintiff also introduced in evidence the record of a chancery proceeding brought by James and Hugh White against James Kincaid, George and James Pogue. This action was brought by Hugh White to enforce specific performance of his contract of purchase of the James Pogue survey. Andrew Bradley was again ordered to survey and locate the James Pogue survey. His report is as follows:

"In conformity to an order of survey from the Hon. the Clay Circuit Court, made at the Octr. term, 1815, I attended on the 6th day of April, 1816, at a place shown at this time by James Kincaide, as the beginning corner of a 500-acre survey in the name of James Pogue also as the beginning of the land in controversy at I, which place is claimed by both parties as the beginning of the same, at which place I·began when executing an order of survey on the same brought on a former occasion. Present James and Hugh White for compts. & James Kincaide for defts. And after swearing the chainmen began at sd. place, & by consent of the parties I used notes taken from actual survey made by myself on the same ground on a former occasion, as aforesaid, & reversing a course thereof ran from thence N. 75 W. 448 poles to a poplar stump, claimed by both parties as a corner to said 500-acre survey, reversing another

course thereof, ran from thence S. 62 W. 200 poles to a
sugar tree marked as a corner, & shown at this time by
James Kincade as a corner to said 500-acre survey &
claimed by both parties as such.

"Having surveyed the above named 500 acres here-
tofore & laid down some of the objects therein repre-
sented, to the satisfaction of both parties, it was con-
sented to by the parties that the balance of the survey
& objects aforesaid, should be laid down from the notes
taken as aforesaid, except the following which I pro-
ceeded to lay down at this time by actual survey (to-wit):
The place where James Kincade began to dig and bore
for salt water at the forks of Goose Creek, an old well
a small distance above the forks of sd. Creek, also the
lower end of the plantation where Jas. Kincade formerly
lived, as per the within plat & notes of reference.

"Then I proceeded to lay down Pogue's 500 acres ac-
cording to the corners from the notes taken as aforesaid,
by beginning at figure 1, on the face of the plat, at this
time a dead standing mulberry tree, a mulberry stump,
a buckeye stump & oak tree fallen out of root and nearly
decayed, being the beginning corner of sd. survey, shown
as aforesaid.

"Thence with the black lines S. 58 W. 52 poles to a
walnut and sugar tree, thence S. 43 W. 52 poles to a
oak and walnut, thence S. 17° E. 40 poles to a poplar
and sugar tree, thence S. 38° E. 100 poles to a sycamore.

"Thence S. 70° W. 36 poles to a beech, thence South
14 poles to a buckeye, thence S. 87° W. 83 poles to two
sycamores. Thence N. 14° W. 29 poles to a sugar tree,
thence N. 20° E. 24 poles to (10) no corner tree found,
patent calling for a walnut, thence N. 6° W. 26 poles to
a maple, thence N. 30° W. 27 poles to a poplar and
buckeye. Thence N. 70° W. 170 poles to an ash, thence
N. 55° W. 79 poles to a sugar tree, all the corners thus
far named existed in Septr. 1807. At which time I exe-
cuted an order of survey on the same ground, thence N.
60 W. 92 poles, no corner tree found, patent calling for
a beech at 16. Thence S. 30° E. 30 poles no corner trees
found, patent calling for two beeches at 17. Thence *S.
30° W.* 274 *poles* patent calling for a stake at 18. Thence
N. 60° W. 100 poles patent calling for a stake at 19.
Thence *N. 13 E.* 276 *poles* to a sugar tree at 20, shown at
this time by *James Kincade,* as a corner of sd. survey,
and claimed by *both parties* as such. Thence N. 62° E.

200 poles to a poplar. Thence S. 75° E. 448 poles to the beginning.''

Plaintiff also introduced in evidence the record of certain proceedings had in a suit in which David Walker was plaintiff and James and Daugherty White, sons of Hugh White, were defendants. These proceedings were had in the year 1836. Jefferson Craig was ordered to locate the James Pogue survey. So much of his report as is material is as follows:

''The plaintiff then directed me to lay Pogue's survey, from the beginning at A, according to the courses and distances called for in a report made by Andrew Bradley, on the 16th day of September, 1807, in a controversy between James Pogue and Samuel Smith.

''The survey is thus laid down as represented by the black lines A, 6, 7, 8, 9, 22, &c., around to A, and it is agreed by the parties that from the point at 9, on the creek, the survey as thus laid down, was laid down according to the marked boundary of Pogue's survey, and includes the dwelling house of Hugh White, Sr., and his lower well.''

In addition to certified copies of the original plat and certificates of the James Pogue 500-acre survey, the two J. & D. Bates 100-acre surveys, and the J. & D. Bates 250-acre survey, the defendant also introduced in evidence certified copies of the original plats and certificates of the J. & D. Bates 500-acre survey, the Betsey Nicholson 400-acre survey, and the Messenger Lewis 150-acre survey.

The plat of the Hugh White 400-acre survey shows that the first line was run S. 13 W. instead of S. 30 W.

The plaintiff also showed that R. L. Blakeman, now surveyor for the defendant, located the various Bates surveys precisely as they are now located by plaintiff's surveyor. Plaintiff also showed by cross examination of Blakeman that the nearest point in the James Pogue 500-acre survey to the beginning corner of the Hugh White 400-acre survey is 16 poles. He also showed that the 20th corner of the James Pogue 500-acre survey was 33 poles north of the 4th corner of the Bates, Walker and Garrard 500-acre survey, and, therefore, that distance north of the Hugh White 400-acre survey.

The respective contentions of plaintiff and defendant have been very exhaustively argued by counsel. It will be impossible to discuss in detail the numerous points made. Counsel for defendant pitches his case on the

well-known rule that established lines of a prior survey control the lines of a subsequent survey calling for the prior survey, Ewins Heirs v. Savary, 3 Bibb., 236; and that lines actually run and marked by the surveyor control in fixing the boundary. Jones v. Hamilton, &c., 137 Ky., 256; Wallace v. Maxwell, 1 J. J. Mar., 457; Baxter v. Evett's Lessee, 7 T. B. Mon., 333. He also points out the fact that the figure of the original plat is important evidence in the location of lines of a survey, in the absence of other controlling influences. Brashears v. Joseph, 32 Ky. L. Rep., 1137. In this connection great stress is laid on the fact that the line of the James Pogue survey with which the first line of the Hugh White 400-acre survey was intended to run is designated in the James Pogue survey as N. 30 E. 274 poles. In addition to this the original plat of the James Pogue survey shows that line to run in the same direction. Not only so, but it is earnestly argued that as a matter of fact Andrew Bradley actually ran the first line of the Hugh White 400-survey S. 30 W. 276 poles. This, it is claimed, is conclusively shown by the distance at which he crossed the two branches, and by the fact that his plat shows that these branches ran into each other and not into the other stream. In the absence of other evidence on the question, the fact that the line of the James Pogue survey called for runs N. 30 E. 274 poles, and that the original plat of this survey shows the same direction, would be very persuasive, if not conclusive, of the proper location of the first line of the Hugh White 400-acre survey. It is, however, conceded by counsel for defendant that the line actually run by Andrew Bradley will control. What line, then, did he run? The crossing of the two branches at substantially the same distances from the beginning point called for by the Hugh White 400-acre survey, would be entitled to very great weight if the evidence were more satisfactory that the beginning corner, as established by the defendant, was in fact the beginning corner of the survey. A careful consideration of the evidence, however, convinces us that there is a discrepancy between the real corner and that fixed by defendant's surveyor; and no doubt if this corner were accurately placed there would be the same discrepancy as is shown in the case of the line contended for by plaintiff. There is some evidence that when the line is run as contended for by defendant, an old marked beech tree will be reached at a place where there are beech

stumps. There is a conflict in the evidence as to whether the tree in question is marked or not, but conceding that it is, the time when it was marked is uncertain. It is just as reasonable to suppose that it was marked when defendant's grantors acquired title in 1886 as that it was marked almost 100 years prior to that time.

On the other hand, what is the evidence of plaintiff as to where the first line of the Hugh White survey was run? Andrew Bradley made the survey. His report fixes the course of the line in question S. 13 W. The plat which he filed with his report shows the same direction. Did he actually survey and locate the line in question as shown by his certificate and plat, or was he mistaken in both? He had made two previous surveys of the James Pogue patent, one in 1807 and one in 1816. How did he then run the questioned line of the Pogue survey? Both of his reports show that he ran it N. 13 E. 276 poles. Why did he do this? Because the then owners of the Pogue survey were present and contending that that course was necessary in order to reach the corners that were then established. This fact is conclusively shown by the survey of 1816, wherein the course is described as follows:

"Thence N. 13 E. 276 poles to a sugar tree at 20, shown at this time by James Kincaid as a corner of said survey, and claimed by both parties as such."

On the occasion in question Andrew Bradley not only ran the survey according to the calls of the patent, but according to the corners as claimed by the parties to the action. He knew then how the questioned line in the Pogue patent ran, and he also knew how the parties then in interest claimed it ran in order to reach the established corners. Hugh White was present and claimed that the questioned line should run N. 13 E. 276 poles. When, therefore, Hugh White went to Andrew Bradley for the purpose of having him make the 400-acre survey to the land west of the James Pogue survey, what was the natural thing for Bradley to do? To survey unappropriated land or land already embraced in the James Pogue survey as established by the parties? It seems to us there could be little doubt on this question. He did not merely follow the line of the original Pogue survey reversed. That line read N. 30 E. 274 poles. He followed the line actually surveyed by him in 1807 and 1816. That line read N. 13 E. 276 poles. Why did he do this? In order to follow the original line of the Pogue

survey rather than the ideal line as called for by the original patent. Not only were the parties in interest contending for this location in 1807 and 1816, but as late as the year 1839 we find the parties in interest asking that the James Pogue survey be located precisely as it had been located by Andrew Bradley in the year 1807. All these circumstances are sufficient to show that the questioned line of the Pogue survey as actually established was N. 13 E. 276 poles. In reversing this line for the purposes of the Hugh White 400-acre survey, Bradley made no mistake, but actually surveyed the line as indicated by his report and plat. The conclusion is further strengthened by a consideration of the surrounding surveys, some of the corners of which appear to be well established. A discussion, however, of their bearing on the question at issue would extend this opinion to too great length.

In conclusion it is only necessary to notice defendant's claim of adverse possession. While it is true that defendant's deed covers the land in question, it is likewise true that the White surveys under which he claims do not cover the land in question. In other words, he has no record title to that part of his deeded boundary that conflicts with the Bates surveys. Having no record title, he and his grantors could acquire title as against a superior title holder in possession only by entering within the lap and holding adverse possession for a period of fifteen years. His evidence fails to show such adverse possession.

Judgment reversed and cause remanded, with directions to enter judgment in favor of plaintiff.

Whole court sitting.