## McKeehan, et al., v. Moore, et al.

(Decided September 25, 1928.)

### Appeal from Whitley Circuit Court.

1. Boundaries.—In action by plaintiffs to quiet title to land, plaintiffs being entitled to recover only upon strength of their own title, and the record presenting simply a question of fact, held that, there never being any dispute between parties holding lands prior to them as to boundaries, it must be presumed that plaintiffs and those under whom parties to action claimed respective title when purchasing land knew what they were buying, making it impossible under evidence to disturb judgment of trial court in favor of defendants, based upon actual location of crooked boundary line; such being controlling, although deed called for straight line between two points.

2. Boundaries.—In action to quiet title to land, a deed operating as an estoppel between the grantor and the grantee, but as between third persons and the grantor the statements therein operating as evidence against the grantor, making it possible to show by other evidence a mistake, held that evidence was sufficient to show that boundary mentioned in deed which party plaintiffs did not claim title under was old fence line and not new fence line as therein stated.

TYE, SILER, GILLIS & SILER for appellants.

STEPHENS & STEELY for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

E. Y. McKeehan's widow and children brought this suit against John Moore's widow and children and his vendees on January 11, 1926, to quiet the plaintiff's title to a body of land in or near the city of Corbin. The defendants by answer controverted the allegations of the petition, alleging that the land was theirs, and praying

that their title be quieted. Voluminous proof was taken, and on final hearing the circuit court dismissed the plaintiff's petition. They appeal.

The land in controversy is, according to one survey, 42 acres, and, according to another, 50 acres. Neither party showed title from the commonwealth. This is conceded on both sides. E. Y. McKeehan and John Moore for a number of years lived on adjoining farms; McKeehan's tract lying south of Moore's. The controversy here is as to the line between them. On May 3, 1858, Jacob Stinson and wife conveyed to Enoch Smith a tract of 200 acres of land. Smith conveyed it to Hiram McKeehan, the father of E. Y. McKeehan, on March 27, 1876, and after his father's death the north end tract was conveyed to E. Y. McKeehan by his brother John on January 12, 1880. In the first of these three deeds the north line of the tract is described in these words: "Thence north to the southeast of Nunn's land; thence southwestwardly with said Nunn's line to a forked white oak: thence northwestwardly with said line to the corner of James Hood's land." In the second deed the north line is described in these words: "Thence N. 42 W. 76 poles to a black oak and two post oaks in Horton Nunn's line; thence with said line back to a small black oak in the Horton Nunn line." In the third deed it is described in practically the same way.

This is the title under which the plaintiffs claim. On the other hand the defendants show these facts: On July 2, 1799, David Johnson took out a survey for 100 acres of land. For value received, this survey was assigned on August 15, 1843, to Wharton Nunn. On January 21, 1845, Wharton Nunn made a survey of 200 acres, the concluding call of which is in these words: "To Gladden's line and with it east 90 poles to the beginning." On the 11th day of July, 1846, Nunn executed a mortgage on this land and some other land. The land was sold by the sheriff, and a deed made to G. Y. Sears by the sheriff on May 31, 1869. A suit was filed, and in this suit it appeared that Sears had in 1868 sold the southern one hundred acres of the Nunn tract to John Moore by a title bond, but had made him no deed. In this suit a deed was made to Moore for this end of the tract. In this deed, as well as in the judgment of the court, the south line of the tract conveyed to Moore is described in these words: "Thence south 20, E. 76 poles to Gladden's line; thence with Gladden's line due east 200 poles to Bledsoe's line of the 9,000-acre survey." The deed to Moore was made

on the 30th day of April, 1885. But he had entered on the land under his bond for title in 1868, and he lived on the land from that time until his death in 1919. McKeehan's father entered on the land south of Moore when he got his deed from Smith, and McKeehan entered when he got his deed from his brother, and lived there until his death in 1897. After his death, his widow and children continued to live there until the filing of this suit. Moore's wife and children also lived on their tract after his death. There was never any dispute at any time between Moore and McKeehan as to the line between them. As far back as any witness knows, Moore had a fence on the line which he claimed. He cultivated and cleared within the fence. The L. & N. Railroad was built through this land in 1880. There was no dispute then between McKeehan and Moore as to where the line between them was located. In 1883 and 1884 Moore cut a large number of ties off the land now claimed by the plaintiffs and sold these ties to E. Y. McKeehan, who well knew where they came from. McKeehan not only set up no claim then to the land, but in 1889 he bought from Moore 35 acres of land, paid Moore for it and accepted a deed from Moore for the land; a considerable part of this tract lies within the boundary the plaintiffs now claim. As far back as 30 years ago the town of Corbin commenced growing; streets were laid off; the land bordering on these streets was cut up into lots. Moore was treated by everybody as the owner of the land. He sold a number of lots to different people, many of whom are made defendants to this action. The town accepted from him the land taken for the streets and from Eleventh street to Sixteenth street the land is now in controversy. The town water plant is located on the ground under Moore, and there was no controversy between Moore and McKeehan while the latter lived or between Moore and McKeehan's heirs as long as Moore lived. The suit was brought about 7 years after Moore's death.

The plaintiffs claim, in substance, that Moore's deed should be run due east from the corner as located by them, according to the calls of his deed. But, on the other hand, it will be observed that his deed calls to run with the Gladden line, and it appears that Aaron Gladden, in June, 1802, received a certificate for one hundred acres of land by virtue of an actual settlement made thereon, lying on the Meat House branch of Lynn Camp creek.

This Gladden survey is referred to as adjoining in the Johnson survey above referred to, and also in a survey of Robert Stinson's and in two other old surveys. The calls of the deed to Moore were taken from the report of W. C. Gillis, who was appointed to make a survey of the land and lay off to Moore the land covered by his bond, which was the southern end of the tract. The field notes of Gillis, which have been filed, as to the south line of the tract, are in these words: "Leaving the creek 180 poles to a small white oak in the old line, thence with the old line south, east and north to the beginning." This clearly shows either that Gillis did not run these lines or that they were then not deemed material. The fact is that the real object of the survey was simply to lay off to Moore the south end of the farm; and it would seem from his field notes that Gillis did not in fact run these lines. However this may be, Moore had then possession of this end of the Nunn farm and the purpose of the proceeding was to cut off to him all of that farm south of the division line then established. The land in controversy is part of an old grant made in 1802, and the record does not show how Nunn acquired title. Perhaps the deeds were not all recorded, but it is clear that the land was then known as Nunn's farm.

The record presents simply a question of fact, and it is the rule of this court not to disturb the chancellor's finding on the facts if on the whole record the mind is left in doubt as to the truth. The plaintiffs can only recover upon the strength of their own title. The deeds under which plaintiffs claim call for the Nunn line. This line was then well established and understood, for Nunn had lived on the place for many years, and from 1868 John Moore had lived on the south end of the place, claiming the south end of the farm. In view of the fact that there was never any dispute between the parties, it must be presumed now that, when the plaintiffs, and those they claim under, bought the land, they knew what they were buying. Time obscures many things. Facts that could easily be proved 60 years ago are now difficult to prove. The timber has been cut, and so many of the corners are missing. The men of that generation who knew the facts are all dead. The surveyors who have attempted to locate these old grants differ as to how they should be located, but there may have been no difficulty 60 years ago in doing this when all the facts were known. Under such circumstances the undisputed possession of the land

by John Moore and the acquiescence in his possession by McKeehan for so many years are entitled to great weight. Moore was selling off these lots 30 years ago. Mrs. McKeehan testifies herself that her husband said then that Moore was honest. McKeehan not only knew the line to which Moore held, but he carefully cautioned those cutting timber on his land not to cut over it. He well knew all the facts when the land in controversy was cut up by streets and laid off into lots by Moore and sales were made by Moore of the lots. In addition to this, the McKeehans years ago sold off all the land they had up to the line claimed by Moore. Moore not only had a fence on the line he claimed, but the corners were marked. It is true that the fence at times was down, but there was always enough on the ground to indicate the extent of Moore's claim, and McKeehan at all times knew where the line was and acquiesced in Moore's claim up to this line. The judgment of the circuit court in favor of Moore's heirs as to it cannot therefore under the evidence be disturbed.

"The actual location of a line controls, and, although a deed calls for a straight line between two points, if the line is in fact located and marked as a crooked line, the latter controls." Johnson v. Harris, 68 S. W. 845, 24 Ky. Law Rep. 451.

To the same effect see Jones v. Hamilton, 137 Ky. 258, 125 S. W. 695; Shackelford v. Walker, 156 Ky. 181, 160 S. W. 807; Rogers Bros. Coal Co. v. Roberts, 216 Ky. 214, 287 S. W. 725.

It is earnestly insisted, however, that the plaintiffs should have recovered what is known in the record as the woodland, consisting of about 10 acres. This tract of land lies outside of Moore's fence, but the proof for Moore is to the effect that, when the fence was rebuilt, it was simply put on another location for convenience, and, while there is some conflicting evidence on the subject, the weight of the evidence shows that John Moore always claimed to the old line, and was in possession up to that line until his death. A deed operates as an estoppel between the grantor and the grantee, but, as between third persons and the grantor, the statements in the deed may be evidence against the grantor, but may be shown by other evidence to be a mistake. In 1917, Moore, when very old, made a deed to another, calling for the fence then standing as McKeehan's line. But the proof is clear that he always claimed the line to be on the old fence row,

and always claimed the land.up to that line. No surveyor locates any line of any deed on the line of the new.fence. There are no marks on it, and there is no evidence that any one before this fence. was built ever claimed that to be the line. Moore built the fence, and the proof does not show that McKeehan claimed the new fence as the line.

Judgment affirmed.